IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL PARSONS, | ) CASE NO.  5:25-CV-01163-BYP |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE BENITA Y. PEARSON |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff, Michael Parsons ("Plaintiff" or "Parsons"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that this matter be REMANDED pursuant to sentence six of 42 U.S.C. § 405(g).

## I.   PROCEDURAL HISTORY

In July 2023, Parsons filed an application for POD and DIB, alleging a disability onset date of April 5, 2020,[2] and claiming he was disabled due to borderline personality disorder, bipolar disorder, depression, anxiety, unexplained weight loss, and cognitive issues – trouble concentrating and learning.  (Transcript

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.
[2] Parsons later amended his alleged onset date to August 1, 2022.  (Transcript ("Tr.") 24.)

1

("Tr.") 24, 79.)  The application was denied initially and upon reconsideration, and Parsons requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 24.)

On September 11, 2024, an ALJ held a hearing, during which Parsons, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 30, 2024, the ALJ issued a written decision finding Parsons was not disabled.  (*Id.* at 24-36.)  The ALJ's decision became final on April 23, 2025, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On June 4, 2025, Parsons filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9-10.)  Parsons asserts the following assignment of error:

> (1) THIS CASE SHOULD BE REMANDED UNDER 42 U.S.C. § 405 (g) BECAUSE THE POST-HEARING COGNITIVE EVALUATION IS NEW AND MATERIAL EVIDENCE, AND PARSONS HAS GOOD CAUSE FOR NOT BEING ABLE TO SUBMIT THE SAME PRIOR TO THE HEARING/DECISION.

(Doc. No. 7 at 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Parsons was born in February 1985 and was 39 years-old at the time of his administrative hearing (Tr. 24, 35), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  He has at least a high school education.  (Tr. 35.)  He has past relevant work as a binding machine feeder/off-loader.  (*Id.* at 34.)

**B.      Relevant Medical Evidence[3]**

**1.      Evidence Considered by the ALJ**

Parsons was in special education classes in school.  (*Id.* at 328-98.)  A Multifactored Evaluation conducted in 1998 revealed "an overall delay in the areas of cognitive ability, academic skills, adaptive behavior, language, and motor skills."  (*Id.* at 332.)  Evaluators noted Parsons' attendance "continue[d] to be an ongoing issue related to his education."  (*Id.*)  Evaluators further noted Parsons "doesn't seem to have basic work-related skills of attendance, initiative, and effort toward doing a good job."  (*Id.*)  Cognitive testing revealed a full-scale IQ of 71.  (*Id.* at 338.)  The testing examiner noted that he/she was "confident that nine times out of ten [Parsons'] score will fall in the range of 67-77."  (*Id.*)  Evaluators found Parsons "could not solve two-step word problems, count coins, or answer questions involving time."  (*Id.* at 339.)  At the time of the Multifactored Evaluation, Parsons had missed 76 ½ days of school.  (*Id.* at 341.)  When Parsons attended school, he "demonstrate[d] the ability to function in the DH program," but Parsons was so often absent that he could not keep up with lessons.  (*Id.*)  An evaluation in 2001 revealed Parsons' adaptive functioning was in the low end of the average range, but Parsons had weaknesses in his abilities in home living, self-direction, and functional academics.  (*Id.* at 390.)  Evaluator Patti Grimes noted that Parsons' teacher "indicates that he has the greatest difficulty applying functional skills to daily living situations and that he is not consistently self-motivated."  (*Id.*)

On August 5, 2022, Parsons saw Jill Thewlis, LICDC, for counseling and reported improved mood and no anger issues.  (*Id.* at 575-77.)  Parsons told Thewlis he was caring for his mother, who lived next door, without any help from his siblings.  (*Id.* at 576.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Parsons challenges only the ALJ's findings regarding his mental limitations, the Court further limits its discussion to Parsons' mental impairments.

On August 17, 2022, Parsons saw Syeda Arshiya Farheen, M.D., for an initial visit regarding his bipolar disorder and personality disorder.  (*Id.* at 512.)  Parsons reported cycles of two or more weeks of a "'wild version' of himself" followed by one or more weeks of a "'depressed'" version of himself.  (*Id.*)  Parsons endorsed distractibility, impulsivity, increased activity, recklessness, decreased sleep, paranoia, and flight of ideas during his "wild" phases.  (*Id.*)  Parsons endorsed depression, poor appetite, extreme fatigue, and increased sleep during his "depressed" phases.  (*Id.*)  He told Dr. Farheen he saw a therapist regularly.  (*Id.*)  On examination, Dr. Farheen found Parsons cooperative with good eye contact, spontaneous, normal speech, calm mood, appropriate affect, logical, coherent, and rational thought process, normal thought content, full orientation, intact attention and concentration, intact memory, and good insight and judgment.  (*Id.* at 514.)  Dr. Farheen noted Parsons' estimated intelligence was "good."  (*Id.*)  Parsons' diagnoses consisted of Bipolar II disorder, bipolar affective disorder, currently depressed, moderate, and recurrent major depressive disorder, remission status unspecified.  (*Id.* at 515.)  Dr. Farheen started Parsons on aripiprazole.  (*Id.*)

On August 31, 2022, Parsons saw Dr. Farheen for follow up and reported that while he had not experienced any side effects on Abilify, he wanted to stop taking it because his family members told him about side effects they had experienced while taking Abilify.  (*Id.* at 520.)  Parsons told Dr. Farheen that since his last appointment he had been feeling depressed with a lack of motivation, lack of interest, and lack of energy.  (*Id.*)  Parsons also endorsed anxiety, manic episodes, and insomnia.  (*Id.*)  Parsons reported he enjoyed spending time with his pet monkey.  (*Id.*)  On examination, Dr. Farheen found good eye contact, appropriately interactive but defensive/hostile demeanor, normal motor activity, appropriate speech, anxious and reportedly depressed mood, constricted and reactive affect, linear, logical, and goal-directed thought process, normal associations, appropriate thought content but blame projecting, perseverating on stressors, and themes of worthlessness and revenge, intact cognition, "poor and good" insight, and good

4

judgment.  (*Id.* at 522-23.)  Dr. Farheen discontinued Abilify and increased Parsons' Depakote dose.  (*Id.* at 524.)

On September 16, 2022, Parsons saw Thewlis for counseling and reported that he had not worked for two years and preferred to stay home with his pets.  (*Id.* at 578-80.)

On September 30, 2022, Parsons saw Dr. Farheen for follow up and reported improvement in his irritability, mood swings, anxiety, and racing thoughts.  (*Id.* at 527.)  He told Dr. Farheen he spent his time caring for his pet monkey, sketching, and assembling complicated Lego sets.  (*Id.*)  He loved to play video games but was not playing them now.  (*Id.*)  Parsons endorsed continued anxiety, depression symptoms, reduced appetite, and good sleep.  (*Id.*)  On examination, Dr. Farheen found appropriate eye contact, normal speech, anxious mood, constricted affect, linear, logical, and goal-directed thought process, normal thought content, intact cognition, and good insight and judgment.  (*Id.* at 529.)  Dr. Farheen continued Depakote and added Lithium.  (*Id.* at 531.)

On October 10, 2022, Parsons saw Thewlis for counseling and reported a "mostly stable" mood.  (*Id.* at 581-83.)

On November 3, 2022, Parsons saw Dr. Farheen for follow up and reported he was doing well.  (*Id.* at 534.)  Parsons complained of an inability to sleep at night and daytime sleepiness.  (*Id.*)  On examination, Dr. Farheen found appropriate eye contact, normal speech, alexithymic mood, constricted affect, linear, logical, and goal-directed thought process, normal thought content, intact cognition, and good judgment and insight.  (*Id.* at 536.)  Dr. Farheen instructed Parsons to take his Depakote at bedtime.  (*Id.* at 538.)

On November 14, 2022, Parsons saw Thewlis for counseling and asked whether she would support him applying for disability.  (*Id.* at 584-85.)  Thewlis told Parsons she was "neutral" but would send records as requested.  (*Id.* at 585.)  Thewlis also encouraged Parsons "to have support from CHS vocational services to possibly find work that would suit him."  (*Id.*)

On January 3, 2023, Parsons saw Dr. Farheen for follow up and reported doing well.  (*Id.* at 540.)  Parsons told Dr. Farheen his Christmas had been okay, but he was glad the holidays were over.  (*Id.*)  Parsons endorsed continued tiredness as well as a fluctuating mood.  (*Id.*)  On examination, Dr. Farheen found appropriate eye contact, articulate speech, depressed and anxious mood, congruent affect, linear, logical, and goal-directed thought process, intact cognition, and good insight and judgment.  (*Id.* at 542.)  Dr. Farheen continued Parsons' medications.  (*Id.* at 544.)

On March 8, 2023, Parsons saw Thewlis for counseling and reported that his mother had died in January.  (*Id.* at 590-91.)  Parsons told Thewlis his psychiatrist suggested he apply for disability, which Parsons planned to do, as he felt "much less angry, tense and anxious" after staying home most of the time for the past three years.  (*Id.* at 591.)  Parsons feared decompensation if he started working again.  (*Id.*)

On April 14, 2023, Parsons saw Thewlis for counseling and reported that he was feeling good and enjoying the weather.  (*Id.* at 596-97.)  He continued to enjoy caring for his pets, although he was sad that one of his cats had died the week before.  (*Id.* at 597.)  Parsons agreed to schedule his next session for five weeks out because he was doing well.  (*Id.*)  Thewlis noted "[a]ll symptoms are currently better and [Parsons] is coping well." (*Id.*)

On May 10, 2023, Parsons saw Dr. Farheen for follow up and reported doing well.  (*Id.* at 552.)  Parsons told Dr. Farheen he had several pets, including a cat, a dog, a cockatiel, a pig, and a monkey, and that he loved caring for his animals.  (*Id.*)  On examination, Dr. Farheen found appropriate eye contact, articulate speech, depressed and anxious mood, congruent affect, linear, logical, and goal-directed thought process, intact cognition, and good insight and judgment.  (*Id.* at 554.)  Dr. Farheen continued Parsons' medications.  (*Id.* at 556.)

On August 22, 2023, Parsons saw Thewlis for counseling and reported he had applied for disability.  (*Id.* at 599-600.)  Parsons told Thewlis he and his wife had met up with other people who owned pet

monkeys.  (*Id.* at 600.)  Parsons stated he did not want to work because he is "'not for this world,' referring to how people act in public."  (*Id.*)

On September 11, 2023, Parsons saw Dr. Farheen for follow up and reported doing well.  (*Id.* at 938.)  Parsons told Dr. Farheen he had "been doing well emotionally," although he got stressed sometimes when he had a "lot of things on his plate."  (*Id.*)  Parsons denied any mood concerns.  (*Id.* at 940.)  On examination, Dr. Farheen found appropriate eye contact, articulate speech, constricted affect, linear, logical, and goal-directed thought process, intact cognition, and good insight and judgment.  (*Id.*)  Dr. Farheen continued Parsons' medications.  (*Id.* at 942.)

On September 18, 2023, Dr. Farheen completed a Mental Medical Source Statement and opined that Parsons was unable "to perform designated task or function on regular, reliable, and sustained schedule" in the following areas: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (*Id.* at 886-88.)  Dr. Farheen further opined Parsons would be absent more than four days per month and would be off task more than

7

20% of the workday.  (*Id.* at 887.)  Dr. Farheen further opined Parsons would need to take unscheduled breaks of more than 15 minutes more than four times per day.  (*Id.*)  In support of these opinions, Dr. Farheen explained:

> Michael Parsons has a working diagnosis of Bipolar 2 disorder generalized anxiety disorder, which has been causing impairment in his mood, concentration, attention and thought process limiting his ability to perform tasks, understand instructions, procedures, or take any work related decisions. He has poor insight into work related matters due to his psychological issues. He will be unable to perform any job related duties or have good relationship with co-workers.

(*Id.* at 888.)

On September 26, 2023, Parsons saw Thewlis for his final counseling session with her before her retirement and thanked her for the help he had received from her.  (*Id.* at 898-99.)  Thewlis noted the "significant progress" Parsons had made since starting counseling years ago, including his improved insight and ability to manage his behavior when angry or frustrated.  (*Id.* at 899.)  Parsons agreed to having his file closed out and would return to counseling if necessary.  (*Id.*)

On November 28, 2023, Parsons saw Dr. Farheen for follow up and reported doing well.  (*Id.* at 944.)  Parsons told Dr. Farheen he had been working on his home, although he was stressed about the work he had to do at home, working on himself, and using coping skills.  (*Id.*)  He also stated he had been caring for his animals "very well."  (*Id.*)  Parsons denied any mood concerns.  (*Id.* at 946.)  On examination, Dr Farheen found appropriate eye contact, articulate speech, constricted affect, linear, logical, and goal-directed thought process, intact cognition, and good insight and judgment.  (*Id.*)  Dr. Farheen noted no symptoms of depression or anxiety.  (*Id.* at 948.)  Dr. Farheen continued Parsons' medications.  (*Id.*)

On December 4, 2023, Parsons saw Tricia Podkowa, LSW, for a Diagnostic Assessment.  (*Id.* at 904-17.)  Parsons reported he struggled with anger and "everyday things," as well as getting along with people.  (*Id.* at 904.)  Crowds annoyed him, and he became agitated when in public.  (*Id.*)  He avoided going to the grocery store.  (*Id.*)  Parsons also endorsed anxiety, which caused occasional depression.  (*Id.*)  He

told Podkowa he was to undergo "'neuropsychological testing'" in January 2024 to determine whether he had a learning disability and ADD.  (*Id.*)  On examination, Podkowa found Parsons cooperative with normal eye contact, clear speech, full affect, concrete thought process, normal thought content, impaired ability to abstract, impaired attention/concentration, poor focus, and fair insight and judgment.  (*Id.* at 908.)

On January 4, 2024, Parsons saw Podkowa for counseling and reported that he had found out that his older brother has Stage 4 cancer.  (*Id.* at 901-02.)  Parsons told Podkowa his mood swings were still "moderate to severe"; while his medication helped stabilize his moods, he still struggled with mood stability at times.  (*Id.* at 902.)  Parsons stated that he was going to have testing done in February 2024 to evaluate whether he had a learning disability and cognitive deficits "due to past poor performance while working." (*Id.*)

On January 18, 2024, Parsons saw Podkowa for counseling and reported that he felt he would never be able to return to work "because of his intellectual functioning & allowing others to 'manipulate him.'" (*Id.* at 951-52.)  Parsons told Podkowa he had "accepted that he may have an intellectual disability & this has made it easier for him to cope…."  (*Id.* at 952.)  Parsons stated that he coped with his depression by interacting with his pet monkey.  (*Id.*)

On February 27, 2024, Parsons saw Deanna Frye, Ph.D., for an assessment of cognitive functions due to a learning disability.  (*Id.* at 1027.)  Parsons reported taking Depakote, topiramate, and Vitamin D. (*Id.*)  He told Dr. Frye he was independent with his activities of daily living.  (*Id.*)  Parsons reported a history of poor academic performance and special classes because of spelling difficulties.  (*Id.* at 1028.)  Dr. Frye noted Parsons "was frequently truant from school and reported at one point his mother was incarcerated for three days due to his truancy."  (*Id.*)  Parsons reported alcohol problems and behavioral issues and told Dr. Frye that "he 'got into a lot of trouble' both at the workplace and outside the work environment, which [Parsons] attributed to acting out and his drug and alcohol use."  (*Id.*)  Parsons could complete his activities

of daily living, but he needed reminders to care for his personal hygiene and his wife shaved his face. (*Id.* at 1029.)  Parsons refused to wash his hair because of sensory issues and also refused to cut his toe nails. (*Id.*)  He could do laundry, clean the house, and cook simple foods. (*Id.*)  He did not like to go to the store because he would have to be around other people, but his wife reported Parsons could go into the store alone to buy things if she sent him photos of what she wanted him to buy. (*Id.*)

Parsons last worked at a print shop in April 2020, when the business shut down because of the COVID-19 pandemic. (*Id.* at 1028.)  Parsons' wife told Dr. Frye that Parsons "could have returned to this employment but she instructed him not to as she noted he was functioning much better without the stress of the job." (*Id.*)  Parsons' wife further reported that Parsons' counselor at the time also recommended Parsons not return to work. (*Id.*)

On examination, Dr. Frye found Parsons appropriately groomed and casually dressed, with logical coherent, and goal-directed thought processes, euthymic mood, and congruent effect. (*Id.* at 1027-28.)  Dr. Frye encouraged Parsons to call and schedule a psychological evaluation for autism spectrum disorder. (*Id.* at 1029.)

On April 4, 2024, Parsons saw Tiesha Purnell, Ed.S., for a neuropsychological testing intake after being referred by his psychiatrist for a learning disability evaluation.  (*Id.* at 1249.)  Parsons reported difficulty being around others, and he held his wife when in large groups of people. (*Id.*)  Going to the grocery store made him anxious. (*Id.*)  Parsons told Purnell he could not count money, and his 11-year-old stepson had to show Parsons how to lace up Parson's work boots. (*Id.*)  He struggled with adaptive behavior skills and depended on his wife for many things. (*Id.*)  His wife helped him with his hygiene and reminded him to shower. (*Id.*)  Parsons could not "consistently" drive a car, and he was a dangerous driver. (*Id.*)

On examination, Purnell found Parsons casually groomed, cooperative, and fully oriented with normal psychomotor activity. (*Id.*)  Purnell further found a helpless mood, flat, appropriate affect, slow and

10

clear speech, normal thought process, concrete thought process, loose/disorganized cognition, impaired memory, below average intellect, both "fair" and "poor" insight and judgment, and fidgety attention. (*Id.* at 1249, 1251.)  Purnell diagnosed Parsons with unspecified adjustment disorder. (*Id.* at 1252.)

On May 2, 2024, Parsons saw Podkowa for counseling and reported doing well. (*Id.* at 1257-58.) Parsons told Podkowa he and his wife had driven to Michigan to buy cannabis gummies. (*Id.*)

On May 28, 2024, Parsons saw Dr. Farheen for follow up and reported he was stressed because he was moving to a new house that day. (*Id.* at 1178.)  Parsons told Dr. Farheen that when he reduced his Depakote dose to 1000 mg, he had become more irritable and angrier, so he increased his dose back to 1250 mg. (*Id.*)  On examination, Dr. Farheen found appropriate eye contact, articulate speech, constricted affect, linear, logical, and goal-oriented thought process, intact cognition, and good insight and judgment. (*Id.* at 1180.)

On June 11, 2024, Parsons saw Tiesha Walker, Ed.S., for psychological testing follow up. (*Id.* at 1253.)  Walker noted Parsons had started cognitive testing and was "[n]early finished." (*Id.*)  Walker further noted that, "[o]n observation, client appears to have very low cognitive abilities." (*Id.*)  Walker stated they would continue testing. (*Id.*)

On June 17, 2024, Parsons saw Podkowa for counseling and reported that he was doing well overall, although he continued to have intermittent anxiety. (*Id.* at 1263-64.)  Parsons told Podkowa he had completed the first part of the standardized cognitive testing the Tuesday before, and he had to return in October 2024 for the second part. (*Id.* at 1264.)  He stated he and his wife had gone to Indiana to attend a monkey convention and had stayed overnight in a hotel. (*Id.*)  Parsons reported that he was able to cope with the social setting because of the focus on the monkeys. (*Id.*)

On June 29, 2024, Walker completed a Mental Medical Source Assessment and opined that Parsons was unable "to perform designated task or function on regular, reliable, and sustained schedule" in the

11

following areas: complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (*Id.* at 1161-63.) Walker further opined Parsons would be absent more than four days per month and off task over 20% of the workday. (*Id.* at 1162.) Walker further opined Parsons would take unscheduled 20-minute breaks about three times a day. (*Id.*) Walker explained the basis for her opinions as follows:

> During the typical workday, based on psychological observations and patient input, mental health impairments directly related to suspected low cognitive abilities will impact daily living tasks. Client's clinical diagnosis is in progress. However, practitioner suspects Autism and/or ADHD. Presently, client is diagnosed w/ adjustment disorder – NOS.
>
> * * *
>
> Client has low cognitive abilities; needs assistance with typical/basic living tasks; in the past previous practitioners have used terms related to "mental retardation." This would now be classified as significant intellectual disability.

(*Id.* at 1162-63.)

### 2. Evidence Submitted to the Appeals Council

After the hearing, Walker completed Parsons' clinical psychological evaluation. (*Id.* at 15-20.) Deborah Koricke, Ph.D., was also listed on the report. (*Id.* at 20.) The testing dates consisted of June 11, 2024, October 15, 2024, and October 22, 2024. (*Id.* at 15.) Walker administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), Personality Assessment Inventory ("PAI"), and Vineland Adaptive Behavior Scales, Third Edition ("Vineland-3") to assess Parsons' cognitive abilities. (*Id.*) Testing revealed a full-scale IQ of 60, which Walker opined "confirms global cognitive deficits that severely impact all areas of [Parsons'] daily functioning." (*Id.* at 16.) Walker explained that the WAIS-IV results further revealed "severely impaired verbal reasoning and comprehension skills," which "significantly hinder

[Parsons'] ability to participate in social or occupational settings requiring verbal exchanges," as well as "significant challenges in nonverbal reasoning and problem-solving tasks." (*Id.*) Parsons' WAIS-IV results also showed "profoundly impaired cognitive processing speed," which Walker opined caused Parsons to "likely experience[] extreme difficulty completing tasks efficiently, particularly those requiring sustained attention and rapid decision-making," and "significantly impacts his ability to functional independently in both personal and occupational domains." (*Id.*) Walker explained that Parsons' "Vineland-3 scores indicate significant deficits across all areas of adaptive functioning." (*Id.* at 17.) Parsons' diagnoses consisted of intellectual disability, severe, major depressive disorder, recurrent, severe, generalized anxiety disorder, and substance use disorder, in remission. (*Id.* at 19.) Walker opined:

> Michael Parsons demonstrates profound cognitive and psychological impairments that render him incapable of independent functioning. His conditions significantly impair his ability to work, maintain relationships, and manage daily responsibilities. Comprehensive support services and accommodations are essential to ensure his safety and quality of life.

(*Id.*)

## C.    State Agency Reports

On October 30, 2023, Mary Hill, Ph.D., reviewed the file and opined that Parsons had moderate limitations in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 82-83.) Dr. Hill further opined Parsons could perform one to three step tasks, complete repetitive, short-cycle work in a static environment without high production expectations, and maintain brief, superficial interactions with coworkers and supervisors. (*Id.* at 85.) Parsons should avoid working with the public. (*Id.*) Dr. Hill further opined Parsons could respond to changes in the work routine that were predictable and explained in advance. (*Id.* at 86.)

On March 13, 2024, on reconsideration, Audrey Todd, Ph.D., affirmed Dr. Hill's findings. (*Id.* at 93-94, 96-98.)

D.     **Hearing Testimony**

During the September 11, 2024 hearing, Parsons testified to the following:

- He lives with his wife. (*Id.* at 47.) He has never held a driver's license. (*Id.* at 48.) He cannot drive, and being behind the wheel of a car scares him. (*Id.*) His wife drives him places. (*Id.* at 49.) She drove him to work when he was working. (*Id.*) He never takes the bus or Uber. (*Id.*)

- He graduated high school. (*Id.*) He was in special needs classes while in school. (*Id.*) He struggled with reading "bigger words" and staying on track. (*Id.*) He got lost in paragraphs and would have to reread things to make sure he understood them. (*Id.*) He can add and subtract small numbers, but not larger numbers. (*Id.*) He's not very good at it. (*Id.*)

- His mother-in-law got him his last job at a printing company. (*Id.* at 50.) He stacked paper into a machine. (*Id.*) They tried to have him perform other jobs at the facility, but he couldn't catch on, so they put him back on stacking paper into the machine. (*Id.*) It was a very simple job, and he would still mess it up. (*Id.* at 63.) He stopped working in 2020 because his anxiety got the better of him and he thought it best to quit. (*Id.* at 52.) He was "mentally deteriorating well beyond before that ever became a thought, the COVID thing." (*Id.* at 53.) He was anxious, irritable, and using alcohol and drugs. (*Id.*) He stopped using alcohol in September 2019. (*Id.*) His anxiety has improved since he stopped working. (*Id.*) He feels better now that he is not around people all the time and "not under the microscope," having to perform a task he doesn't know how to do and feeling judged for doing it wrong. (*Id.*)

- He was fired twice, once for attendance and once for doing drugs with a coworker in the parking lot. (*Id.* at 55.)

- He sees Dr. Farheen and a counselor for his anxiety. (*Id.* at 54.) He sees Dr. Farheen every three months, and she prescribes his medication. (*Id.*) He takes 1500 mg of Depakote. (*Id.* at 57.) He takes marijuana gummies for anxiety once a week or less. (*Id.* at 58.) He gets them on his own since it is legal now. (*Id.*)

- He sees his counselor every month. (*Id.* at 54.) He recently started an evaluation for autism. (*Id.*) The symptoms he feels affect his ability to work consist of not being able to understand things, such as the concept of money, and his anxiety around people, which causes him to lose focus. (*Id.* at 55.) His 11-year-old stepson had to help him lace his boots because he didn't know how to do it. (*Id.* at 56.) He still does not know how to lace his boots. (*Id.*) His wife does it for him. (*Id.*)

- He was able to work for several years despite struggling with basic things such as tying his shoes because his job wanted him to pick something up and carry it, and he thought that was "the most easiest thing you can ask anyone to do." (*Id.*) He could not catch on to doing anything else, so he always ended up being the guy that picks things up. (*Id.* at 57.) He could not do that job today because being in a work environment scares

him and he cannot physically do it anymore. (*Id.* at 63.) His fear of being around people is worse now than it was before. (*Id.* at 63-64.) If a supervisor was telling him what to do or correcting his work, he would be very upset and standoffish. (*Id.* at 66.) He wouldn't take someone telling him what do very well, and his anxiety would cause him to respond in a negative way. (*Id.*) He would walk off, or not do the job at hand, or not go to work the next day. (*Id.* at 67.)

• The first thing he does in the morning is take the dog out. (*Id.* at 59.) He watches TV. (*Id.*) He's on his phone for most of the day. (*Id.*) He did not leave the house the day before. (*Id.* at 60.) His wife watched the debate, they ate dinner, and he did some coloring. (*Id.*) He shaded a picture of three horses. (*Id.*) He has been doing that since he's been off work, and it is very relaxing. (*Id.*) Nobody came over. (*Id.*)

• He can microwave things. (*Id.*) He occasionally puts clothes in the wash, but he hardly ever does, and he might take the clothes out of the wash and put them in the dryer. (*Id.* at 60-61.) His wife folds the clothes. (*Id.* at 61.) He occasionally mows the lawn. (*Id.*) His wife does most of the grocery shopping because he hates going inside the store. (*Id.*) He feels like people are staring at him and he gets very anxious. (*Id.*) His wife may send him in for one or two items, and she will put a picture of the item and the aisle number on his phone so he can find them. (*Id.*) He sees his stepson a few times a week and his wife's ex once a week. (*Id.* at 62.) His stepson comes over to the house to hang out, and his wife and stepson will go places together. (*Id.*) Sometimes his stepson helps with things around the house. (*Id.*) He leaves the house a few times a week. (*Id.* at 68.) His anxiety or PTSD prevents him from leaving the house somedays; he feels like most people are not kind and don't mean well, and that scares him. (*Id.*) He doesn't even want his wife to go out, but he realizes that they have to leave the house on some days. (*Id.*) He takes extra medication if they are going to leave the house. (*Id.* at 68-69.)

• He is not good with interacting with people. (*Id.* at 66.) He feels judged when he goes out in public. (*Id.*)

• Lately he has been obsessed with the Starliner space craft and has been reading everything he can about space travel in the last 60 years. (*Id.* at 59.) He can read, but he has to reread things because he doesn't retain information like everyone else. (*Id.* at 65.) He obsesses over things a lot, and all his attention and focus go to that obsession. (*Id.*) He will not do things he should be doing or is supposed to be doing because of that obsession. (*Id.*) He has been that way his entire life. (*Id.*) The day before, he should have gotten up and fed the animals before his wife did it instead of sitting on his phone. (*Id.* at 66.)

• He recently attended a conference for people with pet monkeys in Indiana, and it was "terrifying." (*Id.* at 64.) He did not want to go, but his wife wanted to go, so he went. (*Id.*) He "stay[ed] engaged with [his] monkey the entire time and that got [him] through it." (*Id.*) He was there for a night and a half. (*Id.*) The drive to and from the conference was stressful because he doesn't like interstates. (*Id.*) He thought thirty people attended the conference, and that was too many. (*Id.*) He kept thinking, "How do I get out of

here?"  (*Id.*)   His monkey helps him in situations like that because it gives him something to focus on and is a stress reliever.  (*Id.* at 65.)

The VE testified Parsons had past work as a binding machine feeder.  (*Id.* at 70.)  The ALJ then posed the following hypothetical question:

> The first hypothetical, assume a hypothetical individual of the claimant's age and education and that past job that you identified. Further assume the individual has the following non-exertional limitations. No unprotected heights, no moving mechanical parts, no operating a motor vehicle, limited to simple instructions and work-related decision, but not at a production rate pace, occasional interactions with supervisors and coworkers, but not with the public, occasional change in a routine work setting. Can that hypothetical individual perform that past job?

(*Id.* at 70-71.)

The VE testified the hypothetical individual would not be able to perform Parsons' past work as a binding machine feeder.  (*Id.* at 71.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as packager, kitchen helper, and office cleaner.  (*Id.*)

The ALJ modified the hypothetical to add that the hypothetical individual would require supervisory redirection every hour to stay on task.  (*Id.* at 72.)  The VE testified that additional limitation would not change the VE's opinion regarding the previously identified jobs.  (*Id.* at 72-73.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

16

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Parsons was insured on the alleged disability onset date, August 1, 2022, and remains insured through December 31, 2025, the date last insured ("DLI"). (Tr. 24.) Therefore, in order to be entitled to POD and DIB, Parsons must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

17

1.   The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2025.

2.   The claimant has not engaged in substantial gainful activity since August 1, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: bipolar disorder, generalized anxiety disorder, other trauma- and stressor-related disorder, and polysubstance abuse (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid all exposure to unprotected heights, moving mechanical parts, and operation of a motor vehicle; the claimant is able to understand, remember, and carry out simple instructions and to make no more than simple, work-related decisions, conducted in a work setting free of production-rate pace, which setting does not require interaction with the public and does not require more than occasional interaction with co-workers and supervisors, which setting is routine, in that it requires no more than occasional changes.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on February **, 1985, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 26-36.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Parsons argues that this case should be remanded under sentence six of 42 U.S.C. § 405(g) as the "post-hearing cognitive evaluation is new and material evidence, and Parsons has good cause for not being able to submit the same prior to the hearing/decision." (Doc. No. 7 at 12.) Parsons asserts that the evidence is new, as the final date of the cognitive testing was October 22, 2024. (*Id.* at 13.) Parsons also argues that the evidence is material, as testing revealed a full-scale IQ of 60. (*Id.* at 14.) Parsons maintains that the ALJ rejected Parsons' low IQ scores from his school records "because Parsons was absent from school so often," and "[i]n doing so, the ALJ did not even find that Parsons had a step 2 severe learning disability (step 2 is a *de minimis* standard)." (*Id.* at 15.) Parsons asserts the ALJ also rejected his claims of low intellect because Parsons "had 'good intellectual functioning', 'intact fund of

20

knowledge['], ability to reason in abstract and intact memory functioning on examination." (*Id.*) However, Parsons argues:

> [T]hese are just general observations that providers have made of Parsons in the course of treating him for his emotional difficulties and not his intellectual problems. Instead, these informal observations, without testing, are far less reliable and valuable as an indicator of one's intellectual functioning as compared to formal cognitive testing. In fact, that is exactly why such testing is done.
>
> Had the ALJ seen the post-hearing cognitive testing, he may very well have believed that Parsons met the [listing12.05(B)] at Step 3. Further, he also may have credited the limitations reached by Dr. Farheen and Dr. Walker. At step 5, he may have believed that Parsons would be off task at work too often, he may have believed that Parsons would require five minute supervisory prompts/reminders once per hour, or he (or counsel) may have put forth/adopted additional hypothetical questions that would more fully encompass Parsons' limitations in light of this recent cognitive testing.

(*Id.*)

Finally, Parsons maintains that he has good cause for not completing the cognitive testing until after the hearing, as shown by the affidavit Parsons attached to his Complaint and the treatment records documenting his efforts to obtain this testing "well before the hearing." (*Id.* at 16.) Although Parsons started the cognitive testing in June 2024—three months before the hearing—the evaluator required Parsons to return in October 2024 to complete the testing. (*Id.* at 17.) Parsons asserts that he did not cause the delay, and in fact complained to his therapist about the delay. (*Id.*)

The Commissioner responds that the ALJ told Parsons he would hold the record open for 14 days, and would then close the record unless he heard from Parsons that there was "'good cause to extend the time.'" (Doc. No. 9 at 2.) The Commissioner asserts that Parsons did not contact the ALJ during those 14 days to request to keep the record open, and the ALJ issued his decision on September 30, 2024. (*Id.*) Parsons did not submit additional evidence until December 16, 2024, when he requested the Appeals Council revisit the ALJ's decision in light of the additional evidence. (*Id.*) The Commissioner argues that Parsons did not meet his burden of showing good cause: "It is well-established Sixth Circuit law that where

Plaintiff's counsel does not seek to have the record remain open to submit additional evidence after a claimant's hearing, this 'in and of itself shows a lack of good cause.'" (*Id.* at 3) (citations omitted). The Commissioner maintains that "under Sixth Circuit law and the law of this Court, because Plaintiff did not seek to hold open the record for post-hearing evidence to be submitted to the ALJ nor contact the ALJ to request the record remain open, his request for a sentence six remand is not supported by good cause and must be denied." (*Id.*) (citations omitted).

In reply, Parsons argues that the Commissioner is "misguided" as to why the ALJ left the record open. (Doc. No. 10 at 1.) The ALJ kept the record open to get outstanding records from Coleman Professional Services, the place where Parsons received mental health treatment, and not for Parsons to complete his cognitive testing. (*Id.*) Parsons asserts that the ALJ "knew that the cognitive testing would not be available for more than forty days after the hearing at the very earliest," and the ALJ's "willingness to leave the record open for only 14 days clearly suggests that he was not willing to wait more than a month for testing to be complete and that he was instead referring to records from Coleman regarding mental health treatment…." (*Id.* at 2.) Parsons maintains that the cases cited by the Commissioner are distinguishable, as in each of those cases the claimants "made no argument detailing why there was good cause to present evidence after the hearing" and the ALJ in this case "implicitly denied the request to hold the record open to obtain the post hearing cognitive testing." (*Id.* at 3.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (stating that "we view

22

newly submitted evidence only to determine whether it meets the requirements for sentence-six remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (same). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (N.D. Ohio Feb. 14, 2017). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 (6th Cir. 2013) (same). Similarly, "[t]o be material, the evidence must relate to the time period at issue – i.e., from the alleged onset date through the date of the ALJ's

23

decision." *Malanowksi v. Comm'r of Soc. Sec.*, No. 1:13CV763, 2014 WL 2593960, at *10 (N.D. Ohio June 10, 2014) (citing *Casey v. Sec'y of Helath & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 685 (6th Cir. 1992)).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 479 F. App'x at 725. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 479 F. App'x at 725. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand[s] for further fact-finding." *Courter*, 479 F. App'x at 725. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U.S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The Court finds Parsons has demonstrated a sentence six remand is appropriate. First, this evidence is "new," as it post-dates both the administrative hearing and the ALJ decision. *See Cross v. Comm'r of*

24

*Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio June 14, 2005).  Second, the Court finds Parsons has shown

good cause for failing to present this evidence sooner, as the testing was not completed until October 2024,

and Parsons was not responsible for the delay.  (Tr. 1253, 1263-64.)  Furthermore, Parsons notified the ALJ

of the ongoing testing during the hearing:

> ALJ: Are you still waiting on anything from the letter?

> ATTY: I don't think we need to leave it open for it. He probably has one or two more therapy sessions at Coleman since the last set we have.

> ALJ: We have a lot from Coleman.

> ATTY: We have quite a bit from there.

> ALJ: So, he has been there a while?

> ATTY: Yes.

> [ATTY]: He is in the middle of sort of a neurocognitive evaluation for autism. He had the first appointment for it, but he has to go back on October 14 and then again on October 26 for them to complete it.

> ALJ: And, that's through whom, Cleveland Clinic?

> ATTY: No, they actually sent the very beginning of the evaluation effective (INAUDIBLE). That's at 28F.

> ALJ: Okay.

> ATTY: That's actually one of the people who filled out the one assessment. I thought it was his therapist because it's pretty illegible, but it's Tiesha Walker.

> ALJ: Yes, that's right.

> ALJ: I would like to get whatever is there from Coleman. If there's something, I would like to have it in there.

> ATTY: Okay.

> ALJ: I will hold the record open for 14 days to get that and I will close the record unless I hear from you that there's good cause to extend the time. I will admit into the record Exhibits 1 through 4A, 1 through 16B, 1 through 11D, 1 through 13E and 1 through 32F.

25

(Tr. 45-46.) Parsons' attorney also informed the ALJ that he thought Parsons was "going to be getting I.Q. tests with this new information coming." (*Id.* at 46.)

Later in the hearing, when questioning Parsons, the ALJ stated, "You're still being evaluated for the autism. Are there symptoms that you have? Things that you do that you think affect your ability to work in that regard?" (*Id.* at 54.)

In the ALJ's decision, the ALJ found:

> In addition to those impairments identified as severe, either the claimant has alleged, or an independent review of the evidence has suggested the existence of the following conditions, which I do not find to be medically determinable: autism spectrum disorder and learning disability. **Investigation for these diagnoses is ongoing but will not be completed until mid-to-late October 2024 [hearing testimony]. Thus far, diagnosis has been deferred (19F/7).**

(*Id.* at 27) (emphasis added).

Based on the foregoing, the Court rejects the Commissioner's argument that the ALJ held the record open for submission of the cognitive testing and that Parsons was required to notify the ALJ of the ongoing testing within 14 days of the hearing and request that the ALJ continue to hold the record open. "As in *Harrison*, there is no indication that [Parsons] or [his] attorney 'sandbagged' the ALJ, staying silent about" the cognitive testing "only to have the tests performed after an unsuccessful hearing or decision." *Hickey v. Comm'r of Soc. Sec.*, Civil Action No. 17-10123, 2017 WL 5710459, at *7 (E.D. Mich. Oct. 30, 2017), *report and recommendation adopted by* 2017 WL 5667977 (E.D. Mich. Nov. 27, 2017).

"The question of whether the new evidence is 'material' is a somewhat closer call." 2017 WL 5710459 at *7. At Step Two, the ALJ founds as follows:

> Records of special education are acknowledged; however, those records also describe a long-standing history of absenteeism [absent more than seventy days, tardy when not absent, stretching back to elementary school days] (1F/5, 14). Even assuming, *arguendo*, that these diagnoses were medically determinable and severe, given the state of the overall evidence, I find that the residual functional capacity as assessed would remain viable.

(Tr. 27.) At Step Three, while the ALJ did not consider Listing 12.05(B), part of the criteria for that listing includes a finding of one extreme limitation, or two marked limitations, in the areas of mental functioning identical to those set forth in the "Paragraph B" criteria (20 C.F.R. Pt. 404, Subpt. P, App'x 1), and the ALJ found only moderate limitations in all four areas. (Tr. 27-28.)

However, the Court agrees with Parsons that the cognitive testing may have caused the ALJ to evaluate the opinions of Dr. Farheen and Walker differently. In evaluating the opinions of Dr. Farheen and Walker, the ALJ found as follows:

> The claimant's psychiatrist, Syeda Farheen, M.D., indicated that the claimant would have marked to extreme limitations in his ability to understand, remember, and carry out instructions, his ability to adapt to the stressors of day-to-day work. In addition, she indicated that the claimant would be absent more than four days per month, off-task more than twenty percent of the time, would need more than four extra breaks of more than fifteen minutes each day. Dr. Farheen has treated the claimant since August of 2022 and is reporting within the bounds of her professional certifications and specialty. However, her treatment records show that the claimant has missed only one appointment, of which he advised staff ahead of time (9F/8). He typically presents as and when appointed and is able to participate in his treatment and planning fully, and without need for additional breaks and without off-task behaviors documented, such that there is really no objective basis for her opinion on absenteeism, off-task behavior, or the need for additional breaks. Otherwise, her opinion overstates, to significant degree, the extent of the limitations in each of the four, psychologically based, work-related areas of function. This opinion is only marginally consistent with, and supported by, the overall evidence of record and is not persuasive.

> Although not received of an acceptable medical source, an opinion dated June 29, 2024, illegibly signed, unattributed, and uncredentialed [hence its treatment as though from an unacceptable medical source] indicated that the claimant would have mild-to-extreme limitations in his ability to understand, remember, and carry out instructions, in his ability to interact with others, in his ability to concentrate, persist and maintain pace and in his ability to adapt to the stressors of day-to- day work. In addition, this opinion indicated that the claimant would miss more than four days per month, that he would be off-task more than twenty percent of the time, and would need unscheduled breaks three times per day of twenty minutes in length. The basis for this opinion included the claimant's input, suggestive of a substitution of the claimant's judgment for the respondent's own, statements from providers remote to the period relevant to this claim, and diagnoses not yet rendered (25F/3-4). For these reasons, and because the opinion is not consistent with the overall evidence of record,

27

> described above in digest form in the analysis of the opinions of Drs. Hill, Todd, and Farheen, this opinion is not consistent with, or supported by, the overall evidence of record and is not persuasive.

(Tr. 33-34.) At least with respect to the second paragraph, which deals with Walker's opinion,[4] the cognitive testing establishes Walker's credentials and provides a basis for her opinion that is not substituting Parsons' judgment for Walker's own.

It is also possible the ALJ may have weighed the evidence at Steps Two and Three differently considering this cognitive testing.

Finally, the Court notes that the Commissioner does not argue that the evidence is immaterial, or that Parsons failed to meet his burden of showing the evidence is material, and therefore, Parsons' arguments regarding materiality are uncontroverted. (Doc. No. 9.)

For all the reasons set forth above, the Court finds that "there is at least a 'reasonable probability' that [the ALJ] would have reached a different disposition." *Hickey*, 2017 WL 5710459 at *8. Therefore, the new evidence is material, and the undersigned recommends the Court find remand under sentence six is warranted.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that this matter be REMANDED pursuant to sentence six of 42 U.S.C. § 405(g).

Date: December 23, 2025                    *s/ Jonathan Greenberg*
                                           Jonathan D. Greenberg
                                           United States Magistrate Judge

---

[4] The Court notes that Parsons' counsel told the ALJ at the hearing that the cognitive testing evaluator, Tiesha Walker, was the person who completed 28F, even though it was illegible. (Tr. 45.) Furthermore, as an aside, the Court fails to understand how the ALJ can discredit Walker's opinion for being inconsistent with Dr. Farheen's, when the ALJ also rejected Dr. Farheen's opinion as unpersuasive. (*Id.* at 33-34.)

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019)